UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PATRICK FITZGERALD CHIOINO, | No. C 05-1816 MHP (pr) |
| Petitioner, | **ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS** |
| v. | |
| SCOTT M. KERNAN, warden; et al., | |
| Respondent. | |

## INTRODUCTION

Patrick Fitzgerald Chioino filed this pro se action seeking a writ of habeas corpus under 28 U.S.C. § 2254. He contends the state appellate court denied him due process when it refused to reinstate the appeal that he had dismissed – a dismissal that he claims he was mentally incompetent to request. This action is now before the court for consideration of the merits of the habeas petition. For the reasons discussed below, the petition will be denied.

## BACKGROUND

The particulars of Chioino's crimes are not relevant to his claim and therefore will not be recounted in great detail. In brief, Chioino went on a crime spree on August 22-23, 2002 in Santa Cruz and Monterey counties during which he broke into several homes, attacked several different people, stole several cars, and shot one of the victims. The crime spree culminated with a high speed car chase during which Chioino hit several cars and eventually got stuck in the center divide of Highway 1. Chioino signaled to police that he was not going to give up, fired at least one shot and emerged from his car; he may have exchanged gunfire

1 with police. Chioino was shot by police and was taken to a hospital for treatment of his
2 gunshot wounds. See Resp. Exh. K (sentencing report).

A.   Procedural History In State Court

   1.   Santa Cruz Case

On January 15, 2003, Chioino was charged in a 45-count criminal complaint in Santa Cruz County Superior Court.

In April 2003, defense counsel and then the trial court declared a doubt as to whether Chioino was competent to stand trial, see Cal. Penal Code § 1368. The court appointed two doctors to examine him, but only one doctor was able to complete an examination because Chioino refused to cooperate when the second doctor attempted to examine him. The one doctor who did examine him concluded that Chioino was malingering and was not incompetent.

At the next hearing, the court observed that Chioino's thought process did not appear to be impaired. The court then decided to set a preliminary hearing, and left open the possibility that Chioino could be evaluated by a second doctor if he chose to cooperate. Resp. Exh. J, 6/23/03 RT 7. Before the preliminary hearing and without having been evaluated by the second doctor, Chioino decided to plead nolo contendere.

On July 28, 2003, Chioino entered a plea bargain for a specified term of 47 years to life in prison. He pled no contest to 8 counts of assault with a deadly weapon, 2 counts of robbery, 1 count of carjacking and 1 count of aggravated kidnapping. He also admitted that he discharged a firearm during a crime and had suffered three prior convictions. In August 2003, Chioino was sentenced to 47 years to life in prison. At the sentencing hearing, defense counsel expressed his concern about Chioino's focus on his family in the audience and lack of attention to the proceedings, whether due to mental disease or by choice, but conceded that the defense had not been able to develop any significant evidence of a mental disease or disorder. Resp. Exh J, 8/25/03 RT 507. The court noted that "there is not doubt in this Court's mind Mr. Chioino knew what he was doing when I accepted his plea and he waived his rights, knowingly and intelligently." 8/25/03 RT 509.

2

Chioino filed a notice of appeal and a declaration in support thereof that stated he was incompetent to enter the plea. See CT 146-147. In his declaration, Chioino wrote that he did not understand the rights he gave up or the consequence of his plea on July 28, 2003 "due to my mental condition." CT 147. He further stated that he was not capable of understanding what had happened at the sentencing proceeding on August 25, 2003 "due to my mental condition." Id. And he stated that his "incapacitated mental state" should have been apparent to the sentencing judge. Id. The court granted Chioino the certificate of probable cause necessary for him to take an appeal from a conviction based on a no contest plea.

On May 3, 2004, appellate counsel filed Chioino's opening brief on appeal. The issues raised in the brief were (a) the trial court's error in failing to adjudicate the question of defendant's mental competence before accepting his plea and (b) the validity of a restitution order.

On May 25, 2004, a Request To Dismiss Appeal was filed on Chioino's behalf. Resp. Exh. E. The request had been signed by Chioino on May 2, 2004 and by appellate counsel on May 24, 2004 and filed the day after appellate counsel signed it. The request did not explain the reason for the requested dismissal. The California Court of Appeal granted the request, dismissed the appeal, and issued the remittitur the next day. See Resp. Exh. F.

Six months later, Chioino tried to reinstate his appeal. Specifically, on November 15, 2004, Chioino's appellate counsel filed a motion to recall the remittitur under California Rule of Court 26(c)(2), which permits the recall of a remittitur upon a showing of good cause. Resp. Exh. C. For ease of understanding, this will be referred to as a motion to reinstate the appeal as that was the desired result.

The motion to reinstate the appeal was denied without explanation by the California Court of Appeal. The California Supreme Court summarily denied Chioino's petition for review in which he alleged that the court of appeal violated his right to due process by not allowing the reinstatement of the appeal.

3

2.     Monterey Case

In addition to the Santa Cruz case described above, Chioino also had a criminal case pending against him in Monterey County Superior Court (Case No. §022872A).  The Monterey case was based on a domestic dispute that occurred the day before the crime spree that led to the Santa Cruz case.  In the Monterey case, Chioino was sentenced in late April 2004 to 22 years in state prison for first degree residential robbery with an enhancement for personal use of a firearm.  See Resp. Exh. C at Exh. A.  A timely appeal was not taken.

The Monterey case is not covered by the present habeas petition and is only mentioned because Chioino paired his request to reinstate the appeal in the Santa Cruz case together with a request to file a late appeal in the Monterey case.  The request to file a late appeal in the Monterey case was granted.  The California Court of Appeal's action in granting the request to file the late appeal in the Monterey case while denying the motion to reinstate the appeal on the Santa Cruz case was not necessarily contradictory because the Monterey case involved the incompetency issue plus the additional problem that trial counsel allegedly refused Chioino's explicit request to file a notice of appeal in the Monterey case.

B.     Mental Incompetency Evidence In Support Of Motion To Reinstate Appeal

In support of the unsuccessful motion to reinstate the appeal, appellate counsel submitted a declaration from Chioino, a declaration from appellate counsel, and various prison records showing mental health problems.  The key time frame is around May 2, 2004, as the question for the state appellate court was whether there was good cause to let Chioino back out of the request to dismiss his appeal that he signed on May 2, 2004.

In his declaration in support of the motion to reinstate the appeal, Chioino stated that he was "heavily medicated" and "sleepy all the time"when he signed the form on May 2, 2004. Resp. Exh. C at Exh. B.  He also explained why he had requested the dismissal of the appeal:  "When I signed the request to dismiss my appeal, I was experiencing enormous anxiety concerning the thought of returning to the trial court.  In this regard, I was shot by the police and suffered serious injuries.  As a result, I was extremely fearful of going to trial since it would cause me to relive the experience of being shot and nearly dying." Id.

4

Appellate counsel declared that when he received Chioino's request to dismiss the appeal on or around May 2, 2004, he "was of the opinion that [Chioino] was mentally competent to make the decision to abandon his appeal." Resp. Exh. C at Exh. P. He further declared that he had not seen the CDC's medical records at the time he made the request to dismiss the appeal. Having since reviewed those records, appellate counsel now had "a doubt as to whether defendant was capable of making a knowing and intelligent decision to dismiss his appeal." Id. Appellate counsel did not explain any details regarding his communications with Chioino about the request to dismiss the appeal.

The motion to reinstate the appeal also included as attachments selected excerpts from Chioino's prison medical records that showed some behavior suggestive of serious mental health problems. Chioino had been observed biting his shoulder on August 4, 2003, in an attempt to remove a bullet that was lodged there. Chioino claimed that one of his exhibits showed that he had been diagnosed in September 2003 as suffering from a depressive disorder with psychotic features; however, the exhibit was considerably more ambiguous in that it stated "R/O" (a standard medical abbreviation for "rule out") and then listed three different diagnoses: psychotic disorder NOS, depressive disorder with psychotic features, and PTSD. Resp. Exh. C at Exh. D. Another page of medical notes from September 6, 2003 (that may or may not have been part of the same report just mentioned as exhibit D), stated that Chioino "knows where he is but not in touch with reality, why he is in MHCS. Thinks for medical reasons." Resp. Exh. C at Exh. E. A September 26, 2003 update stated that he refused to be seen, was exhibiting "bizarre behavior" and was "possibly psychotic w/ poor reality testing." Resp. Exh. C at Exh. F. On January 30, 2004, a prison psychologist reported that Chioino was uncooperative with an interview, exhibiting a "psychotic process" and suffering from "delusional thinking (he thinks he's in court rather than prison)." Resp. Exh. C at Exh. G. Chioino was transferred to Mule Creek State Prison because he was refusing medications and "in an apparently psychotic state" on February 8, 2004. Resp. Exh. C at Exh. H. A doctor evaluated Chioino and opined that he was suffering from acute and chronic schizophrenia and earlier had been observed biting his lower ankle (the site of

another bullet fragment). Resp. Exh. C at Exh. I. The doctor also noted that "there is minimal documentation or history of any major mental illness until his arrest and now the hopelessness of being a lifer." Id. The doctor determined that Chioino had to be involuntarily medicated, apparently for the first time. Chioino was put on a regimen including two antipsychotic drugs and a third drug typically given to people suffering from parkinsonism as of February 26, 2004, although neither the application nor the exhibits show whether this medication continued into May 2004. Resp. Exh. C at p. 7 and Exh. J. The side effects of these three drugs may include confusion, drowsiness, anxiety, mental confusion, and impaired memory. On May 3, 2004, medical staff saw Chioino because he reported that he had attempted to operate on himself by removing a surgical screw with his teeth; staff determined to follow-up as needed and keep him in extended outpatient placement but did not otherwise provide any treatment or hospitalization. Resp. Exh. C at Exh. N. On September 14, 2004 – four months after the appeal was dismissed – medical staff noted in progress notes that Chioino was engaged in illogical reasoning and appeared paranoid, although the notes do not indicate that any treatment was initiated or changed as a result for this patient in the extended outpatient program. Resp. Exh. C at Exh. O.

**JURISDICTION AND VENUE**

This court has subject matter jurisdiction over this habeas action for relief under 28 U.S.C. § 2254. 28 U.S.C. § 1331. This action is in the proper venue because the challenged conviction occurred in Santa Cruz County, California, within this judicial district. 28 U.S.C. §§ 84, 2241(d).

**EXHAUSTION**

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court. See 28 U.S.C. § 2254(b), (c). State court remedies were exhausted for the claim raised in the petition.

6

## STANDARD OF REVIEW

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts."  Williams v. Taylor, 529 U.S. 362, 412-13 (2000).

 "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  Id. at 413.  "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 411.  A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable."  Id. at 409.

Where, as here, the state court gives no reasoned explanation of its decision on a petitioner's federal claim, the habeas court does an independent review of the record as it is the only means of deciding whether the state court's decision was objectively reasonable. See Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003); Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000).

7

**DISCUSSION**

A.  Lack of Clearly Established Law On Claimed Right

The threshold question in this case is whether there is clearly established law as determined by the U.S. Supreme Court such that relief could be granted consistent with 28 U.S.C. § 2254(d). The Supreme Court has never held that a criminal defendant must competent to waive an appeal in a non-capital case. The closest Supreme Court authorities to the claim at issue appear to be Evitts v. Lucey, 469 U.S. 387 (1985), and Rees v. Peyton, 384 U.S. 312 (1966).

In Evitts v. Lucey, the Supreme Court recognized that the Constitution does not require a state to provide an appeal as of right to criminal defendants, but if a state does provide "appellate courts as 'an integral part of the . . . system for finally adjudicating the guilt or innocence of a defendant," [citation] the procedures used in deciding appeals must comport with the demands of the Due Process and Equal Protection Clauses of the Constitution." 469 U.S. at 393. Evitts held that a first appeal as of right violates due process of law if the appellant does not have the effective assistance of an attorney. See id. at 396-400. Evitts offers no more specific guidance to this case than that an appeal as of right must comport with due process.

In Rees v. Peyton, the Supreme Court decided not to decide a competency question. The Court had received a petition for writ of certiorari from a capital defendant who directed his counsel to withdraw the petition a month after it was filed and to forego any further legal proceedings. Counsel told the Court he couldn't accede to the request in light of his doubt about his client's competency. 384 U.S. at 313. The Court remanded the case to the district court to make a finding on Rees' mental competence and report to the Court. "Until that step has been taken, we do not consider ourselves in a position to determine what disposition should be made of Rees' petition for certiorari." 384 U.S. at 314. The Court did not announce a standard for competency or whether it would allow the petition to be withdrawn, but simply remanded for further factual development to determine petitioner's mental capacity, i.e., "whether he has capacity to appreciate his position and make a rational choice

with respect to continuing or abandoning the litigation or on the other hand whether he is suffering from a mental disease, disorder, or defect which may substantially affect his capacity in the premises." 384 U.S. at 314.  Rees is not clearly established law for the proposition that a mentally incompetent prisoner cannot withdraw his appeal and provides no clearly established law on any point. Williams (Terry) v. Taylor, 529 U.S. at 412 ("clearly established law" phrase in § 2254(d) refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions").

There have been several death penalty cases about the prisoner's right to forego further appellate or habeas review and about people being allowed to pursue "next friend" petitions when a prisoner opts to end his appeals. See, e.g., Comer v. Schriro, No. 98-99003, slip op. 11115 (9th Cir. Sept. 13, 2006); Rohan ex rel. Gates v. Woodford, 334 F.3d 803 (9th Cir.), cert. denied, 540 U.S. 1069 (2003); see also Whitmore v. Arkansas, 495 U.S. 149, 165 (1990) (no next friend standing to pursue collateral challenge when capital defendant competently chose to forego further proceedings).

Comer v. Schriro was a pre-AEDPA case and review was not constrained by 28 U.S.C. § 2254(d). Comer, slip op. at 11146. Comer considered the petitioner's competency to bear on the voluntariness of his waiver based on the idea that a waiver is not voluntary if it stems from either mental or physical coercion. See id. at 11132-33. Comer found the petitioner's waiver of state court appellate review to be voluntary but nonetheless determined that the merits of the petitioner's claims were reviewable because of the unique nature of death penalty sentences.

In Rohan ex rel. Gates v. Woodford, the court found that the statutory right to counsel in federal post-conviction relief proceedings in capital cases implied a statutory right to competence for those proceedings, and that the prisoner was entitled to a stay until he was found competent so that he could provide input on an ineffective assistance of counsel claim and other claims that could potentially benefit from ability to communicate rationally with counsel. See id. at 819; but see id. at 819 n.11 (leaving open the possibility that some record-based or non-factual claims could be decided without a competent defendant).  The court

9

1 explained that the right of competence was well-settled at common law but meeting with "a
2 mixed constitutional reception." 334 F.3d at 808. "Capacity for rational communication
3 once mattered because it meant the ability to defend oneself . . . while it now means the
4 ability to assist counsel in one's defense. . . . But whatever the rationale for the requirement,
5 capacity to communicate remains a cornerstone of due process at trial. The right of
6 competence <u>after</u> trial, now addressed almost exclusively in the context of competence to be
7 executed, has taken a different course" that in death penalty cases involves Eighth
8 Amendment concerns. <u>Id.</u> at 808-09 (citations and internal quotation marks omitted).

9 The death penalty cases make it quite clear that the penalty makes the analysis
10 different. That is, an unreviewed death sentence would result in the killing of an individual
11 and that brings into play various other constitutional considerations that do not weigh in the
12 non-capital case. The death penalty cases cannot be extended to the non-death penalty
13 situation when it comes to the constitutional issues attendant in appellate and habeas review.

14 This court concludes that there is no clearly established federal law as determined by
15 the Supreme Court of the United States on the right to competency during an appeal or that a
16 right of appeal may only be waived if the petitioner is competent. The California courts'
17 rejection of Chioino's claim cannot be said to be contrary to or an unreasonable application of
18 the nonexistent law. Chioino thus cannot obtain the writ of habeas corpus due to the absence
19 of Supreme Court authority on point. <u>See</u> 28 U.S.C. § 2254(d).

20 In the interest of completeness, the court will in the next section decide the merits of
21 the claim based on the assumption that a criminal defendant's dismissal of his state court
22 appeal is not valid unless he was competent at the time he dismissed it. Assuming <u>arguendo</u>
23 there was a right of competency during a state court appeal in a non-capital case, and that a
24 criminal defendant could not waive his right to appeal unless competent to do so, the general
25 rules regarding competency would apply.

B.   <u>Chioino Has Not Shown He Was Not Competent To Dismiss His Appeal</u>

A waiver of a criminal defendant's right is not voluntary unless, among other things, it is knowing, intelligent and voluntary. See <u>Comer</u>, slip op. at 11132-33 (9th Cir. Sept. 13, 2006). A waiver made while one is incompetent is not valid as it is not knowing or voluntary. <u>See generally</u> <u>id.</u> (considering whether capital defendant's waiver of habeas appeal right was voluntary)

The general standard for competence is whether the defendant has "'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and has 'a rational as well as factual understanding of the proceedings against him.'" <u>Godinez v. Moran</u>, 509 U.S. 389, 396 (1993) (quoting <u>Dusky v. United States</u>, 362 U.S. 402 (1960)); <u>see id.</u> at 398-99 (rejecting argument that test for competence to plead guilty is more rigorous than test for competence to stand trial). "Requiring that a criminal defendant be competent has a modest aim: It seeks to ensure that he has the capacity to understand the proceedings and to assist counsel." <u>Id.</u> at 402.

"Although no particular facts signal incompetence, suggestive evidence includes a defendant's demeanor before the trial court, previous irrational behavior, and available medical evaluations." <u>Moran v. Godinez</u>, 57 F.3d 690, 695 (9th Cir. 1997), <u>cert. denied</u>, 516 U.S. 976 (1995). Courts have generally found sufficient evidence of incompetence in cases of lengthy histories of acute psychosis and psychiatric treatment or extremely erratic and irrational behavior during the course of the trial. See, e.g., <u>Moore v. United States</u>, 464 F.2d 663, 665 (9th Cir. 1972) (defendant repeatedly hospitalized for acute mental illness and hallucinations); <u>Tillery v. Eyman</u>, 492 F.2d 1056, 1057-58 (9th Cir. 1974) (defendant screamed throughout nights, laughed at jury, made gestures at bailiff, disrobed in courtroom and butted his head through glass window). But see <u>Williams v. Woodford</u>, 384 F.3d 567, 606 (9th Cir. 2003), <u>cert. denied</u>, 126 S. Ct. 419 (2005) (lack of attentiveness before the trial judge is not enough to create a good faith doubt about a defendant's competency); <u>Odle v. Woodford</u>, 238 F.3d 1084, 1088, 1089 n.6 (9th Cir. 2001), <u>cert. denied</u>, 534 U.S. 888 (2001) (defendant's calm behavior in courtroom did not refute large body of clinical evidence

11

casting doubt on his competency).

The question here is whether Chioino had a "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and "had a rational as well as factual understanding of the proceedings against him" when he requested the dismissal of his appeal. See Godinez, 509 U.S. at 396. The evidence in the record does not demonstrate Chioino lacked such an ability and understanding at the time he dismissed his appeal.

Chioino had never been determined to be actually incompetent. The trial court had suspended proceedings when a doubt about Chioino's competency was declared and had appointed a psychologist and a psychiatrist to examine him. The psychologist who was able to examine him determined that Chioino was not mentally incompetent but was faking it. See Resp. Suppl. Exh. L, CT 181 (axis I diagnosis of malingering and axis II diagnosis of antisocial personality disorder). Although the psychiatrist who was set to examine Chioino was unable to do so because Chioino refused to go to the interview, the circumstances of his refusal are as suggestive of a mental health problem as general defiance of authority: Chioinio reportedly "was refusing to leave his cell, was standing there naked in the middle of his cell, and was threatening to throw urine or other matter on any deputies who attempted to effect entry into his cell." Resp. Suppl. Exh. L, CT 185. This incident occurred ten months before Chioino dismissed his appeal. The trial court held a hearing thereafter during which the judge agreed with the assessment that Chioino understood the proceedings and was feigning incompetency: "I mean, the concern I have is that your client sits there and makes observations and statements in court that are completely lucid, completely understandable and show a thought process that is not in any way impaired." Resp. Exh. J, 6/23/03 RT 6. There is no indication of any problem at the change-of-plea hearing. Defense counsel stated at the change-of-plea hearing that the arrangement had been made at the specific request of his client, both in writing and orally. Resp. Exh. J, 7/28/03 RT 261. The foregoing provides substantial evidence that a case could not be made for actual incompetence while Chioino was in the superior court. The more relevant evidence is that closer in time to the dismissal of the appeal in May 2004, to which the analysis now turns.

12

1 Appellate counsel for Chionio did not see anything suggestive of incompetence when
2 Chioino requested his help in having the appeal dismissed. Appellate counsel provides no
3 information about the interactions that led to the dismissal, but certain things can be
4 determined from the non-information. Unless counsel routinely sent requests for dismissal of
5 appeals to clients, Chioino had to ask appellate counsel for such an action on one day and
6 decide to follow through with it on another day by signing the document counsel prepared for
7 him. Appellate counsel, who is an experienced appellate attorney at the Sixth District
8 Appellate Program, should have known how difficult it would be to undo the decision once
9 he filed a request to dismiss the appeal. Yet appellate counsel did not see anything
10 suggesting incompetency when his client asked him to dismiss the appeal. This non-
11 observance of evidence of incompetency gains significance in light of the fact that the main
12 issue in the appeal brief appellate counsel had just written concerned the inquiry into
13 Chioino's incompetence in the trial court. A client requesting the dismissal of a criminal
14 appeal is an extremely unusual request to appellate counsel, and it simply cannot be expected
15 that competent appellate counsel would have done the legwork to make that happen without
16 some inquiry into the client's mindset, especially where (as here) one of the issues on appeal
17 concerned the client's competency when he pled no contest to the charges. Appellate counsel
18 reports simply that he thought Chioino was mentally competent to make the decision to
19 abandon his appeal when counsel received the request from Chioino. Counsel is perhaps in
20 the best position to evaluate a client's comprehension of the legal proceedings, see Hernandez
21 v. Ylst, 930 F.2d 714, 718 (9th Cir. 1991), and here did not believe his client was mentally
22 incompetent when he asked to dismiss his appeal.

23 Chioino's declaration also does not show that he was incompetent at the time he
24 requested the dismissal of the appeal. Chioino's statement of his motive suggests he was not
25 irrational. "When I signed the request to dismiss my appeal, I was experiencing enormous
26 anxiety concerning the thought of returning to the trial court. In this regard, I was shot by the
27 police and suffered serious injuries. As a result, I was extremely fearful of going to trial
28 since it would cause me to relive the experience of being shot and nearly dying." Resp. Exh.

C at Exh. B.  As respondent points out, the request to dismissal his appeal was quite rational and consistent with the expressed intent.  Specifically, if he succeeded on appeal, Chioino would have to do that which he wanted to avoid, i.e., going to trial and revisiting the shooting and all the acts that led up to it that were causing him anxiety.

At about the same time he was trying to dismiss the appeal in the Santa Cruz case, he was trying to pursue an appeal in the Monterey.   Specifically, he was sentenced on a guilty plea to 22 years on April 27, 2004 in the Monterey case, and asked counsel on April 28, 2004 to file an appeal.  When counsel refused to file an appeal, Chioino thought for several months that he could not appeal.  The fact that Chioino had just been told his Monterey case was over when he asked to dismiss the Santa Cruz appeal suggests that Chioino had made a determination that the Santa Cruz appeal was pointless because even if he got his 47-to-life sentence overturned, he still had the 22 year sentence in the Monterey case as well as whatever would be the sentence on the Santa Cruz case if he were convicted.  If Chioino chose to dismiss the appeal while experiencing a sense of futility or a fit of pique, he would not be entitled to undo his dismissal of the appeal.  Neither despair nor anger come close to the incompetence needed to possibly undo the requested dismissal of the appeal.

Chioino's declaration also states that he was "heavily medicated" and "sleepy all the time" when he signed the form on May 2, 2004.  Resp. Exh. C at Exh. B.   Merely being heavily medicated or sleepy does not make one incompetent, especially when the drugs were antipsychotic drugs intended to aid rather than hamper the patient's mental functioning.  Likewise, Chioino's reported high degree of anxiety does not equal mental incompetency. See Williams v. Woodford, 384 F.3d at 606 ("we agree with the Eleventh Circuit that 'there is no constitutional prohibition against the trial and conviction of a defendant who fails to pay attention in court – whether out of indifference, fear, confusion, boredom, or sleepiness-- unless that defendant cannot understand the nature of the proceedings against him or adequately assist counsel in conducting a defense.'")

The medical records attached to the motion to reinstate the appeal do show a person with serious mental illness, but do not establish his mental incompetence.  See United States

14

v. Leggett, 162 F.3d 237, 244 (3d Cir. 1998), cert. denied, 528 U.S. 868 (1999) (collecting cases on the point that not all mental illness can be equated with incompetence to stand trial). Many of the records were generated months before Chioino dismissed his appeal and before he was medicated, and thus are of limited value in determining his mental state when he requested the dismissal. The medical records presented show several instances of bizarre behavior and that Chioino suffered from mental illness, although the precise nature of the mental illness was never settled upon (i.e., some reported it as a psychotic illness while one doctor identified it as chronic schizophrenia). Chioino was involuntarily put on antipsychotic medications in February 2004, although it is unclear whether he was still taking those same medications three months later when he dismissed his appeal. He does state in his declaration that he was taking medications that made him sleepy and anxious, so it may be that the medications he refers to in his declaration are the same referred to in the medical records. Assuming he was taking the anti-psychotic medications in May 2004, he has not shown that these medications made him mentally incompetent.

The strongest piece of evidence in favor of Chioino's contention is a May 3, 2004 medical record that reported that Chioino had reported that he attempted to operate on himself by removing a surgical screw with his teeth. This record supports a determination of an active mental illness at just the time Chioino was requesting the dismissal of his state court appeal. The health care provider did not see this conduct as requiring hospitalization or immediate intervention but determined instead to follow-up as needed and keep Chiono in the extended outpatient placement. However, when considered in light of all the evidence, this one record is not sufficient to show that Chioino was incompetent when he requested the abandonment of his appeal.

While the evidence presented to this court and to the state courts certainly supports a determination that Chioino was mentally ill, not every mental illness means that the person is incompetent. Considering all the information in the record, Chioino did not show that he lacked a sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding or that he lacked a rational as well as factual understanding of the

15

proceedings against him when he waived his right to further proceedings on appeal. See Godinez v. Moran, 509 U.S. at 402. Assuming that due process required that Chioino be mentally competent at the time he dismissed his appeal, the California Supreme Court's rejection of his due process claim was not an objectively unreasonable application of the law.

## CONCLUSION

The state court's rejection of Chioino's claim was not contrary to or an unreasonable application of clearly established federal law. Chioino is not entitled to a writ of habeas corpus on his claim. The petition for writ of habeas corpus therefore is DENIED. The clerk shall close the file.

IT IS SO ORDERED.

DATED: September 29, 2006

Marilyn Hall Patel
United States District Judge